1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  MATTHEW C.,[1] | Case No.: 24cv322-JES (LR) |
| 12                                Plaintiff, | **REPORT AND** |
| 13  v. | **RECOMMENDATION** |
| | **REGARDING JOINT MOTION** |
| 14  COMMISSIONER OF SOCIAL | **FOR JUDICIAL REVIEW OF THE** |
| 15  SECURITY,[2] | **FINAL DECISION OF THE** |
| | **COMMISSIONER OF SOCIAL** |
| 16                                Defendant. | **SECURITY** |
| 17 | |
| 18 | **[ECF NO. 12]** |

19       This Report and Recommendation is submitted to the Honorable James E.

20  Simmons, Jr., United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Civil

21  Local Rule 72.1(c) of the United States District Court for the Southern District of

22

23  _____

24  [1] Pursuant to Civil Local Rule 7.1(e)(6)(b), the Court's opinions in Social Security cases filed under
25  42 U.S.C. § 405(g) "refer to any non-government parties by using only their first name and last initial."

26  [2] Plaintiff named Martin O'Malley, who was the Acting Commissioner of Social Security when Plaintiff
    filed his Complaint on February 21, 2024, as a Defendant in this action.  (See ECF No. 1 at 1.)  The
27  Acting Commissioner of the Social Security resigned effective February 17, 2025, and a new Acting
    Commissioner has not yet been officially named.  Pursuant to Federal Rule of Civil Procedure 17(d),
28  Defendant is therefore referred to "by official title rather than by name."  Fed. R. Civ. P. 17(d).

California.  On February 21, 2024, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security denying his application for social security disability benefits.  (ECF No. 1.)

Now pending before the Court is the parties' "Joint Motion for Judicial Review" ("Joint Motion).  (ECF No. 12 ("J. Mot.").)  For the reasons set forth below, the Court **RECOMMENDS** that the District Judge **AFFIRM** the Commissioner's decision.

# I.      PROCEDURAL BACKGROUND

On October 13, 2021, Plaintiff filed an application for disability insurance benefits under Title II[3] of the Social Security Act, alleging disability beginning on May 14, 2021. (See ECF No. 8 ("AR")[4] at 17.)  After his application was denied initially and upon reconsideration, Plaintiff requested an administrative hearing before an administrative law judge ("ALJ").  (See id. at 145–46.)  The ALJ held this hearing on March 30, 2023. (See id. at 38.)  Plaintiff appeared at the hearing with counsel, and testimony was taken from him and from a vocational expert ("VE").  (See id. at 38–74.)

On May 3, 2023 the ALJ issued a written decision that Plaintiff had not been under a disability, as defined in the Social Security Act, from May 14, 2021, through the date of the decision.  (See id. at 17–32.)  The ALJ's decision became the final decision of the

---

[3] The Court notes that the records contain Plaintiff's statement that he applied for disability insurance benefits "under Title II and Part A of Title XVIII of the Social Security Act."  (ECF No. 8 at 215.)  Part A of Title XIII of the Social Security Act is commonly referred to as the "Medicare Act" and "provides insurance for the cost of hospital and related prehospital claims."  Heckler v. Ringer, 466 U.S. 602, 605 (1984).  The Complaint, the Joint Motion, and the ALJ's decision are all concerned solely with Plaintiff's application under Title II of the Social Security Act.  (See ECF No. 1 at 1; ECF No. 8 at 17; ECF No. 12 at 2.)  The Court therefore limits its discussion to the disputed issue, which is Plaintiff's application under Title II of the Social Security Act.

[4] "AR" refers to the Administrative Record filed on April 22, 2024.  (ECF No. 8.)  The Court's citations to the AR in this Report and Recommendation are to the page numbers listed on the original document rather than the page numbers designated by the Court's Case Management/Electronic Case Filing System ("CM/ECF").  For all other documents, the Court's citations are to the page numbers affixed by the CM/ECF.

Commissioner on December 19, 2023, when the Appeals Council denied Plaintiff's request for review.  (See id. at 1–3.)  This timely civil action followed.  (See ECF No. 1.)

## II.    SUMMARY OF THE ALJ'S FINDINGS

The ALJ followed the Commissioner's five-step sequential evaluation process. See 20 C.F.R. § 404.1520.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (See AR at 20.)  At step two, the ALJ found that Plaintiff had the following severe impairments: mild atrophy of the left upper extremity, degenerative disc disease of the lumbar spine, labral tear of the left hip, depersonalization-derealization syndrome, insomnia, post-traumatic stress disorder ("PTSD"), bipolar disorder, obsessive compulsive disorder ("OCD"), and personality disorder.  (Id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (Id. at 21.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to:

> perform medium work as defined in 20 CFR 404.1567(c) except he can frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds.  He can frequently balance, stoop, kneel, crouch, and crawl.  He can frequently handle and finger with the non-dominant left upper extremity.  He must avoid concentrated exposure to extreme cold, extreme heat, vibrations, fumes, odors, gases, and other pulmonary irritants, as well as hazards, such as operational control of moving machinery and unprotected heights.  He can understand, remember, and carry out simple, routine tasks, have only occasional interaction with the general public, only occasional work-related, non-personal, non-social interaction with co-workers and supervisors.  He is limited to jobs requiring only simple work-related decisions; however, he can keep pace sufficiently to complete tasks and meet quotas typically found in unskilled work.

(Id. at 23.)

At step four, the ALJ found that Plaintiff could not perform any past relevant work. (See id. at 30.)  At step five, based on the VE testimony, the ALJ found that a

3

hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of occupations that existed in significant numbers in the national economy. (Id. at 31.)  The ALJ then found that Plaintiff was not disabled from May 14, 2021, through the date of the ALJ's decision.  (Id. at 32.)

## III.  DISPUTED ISSUES

As reflected in the parties' Joint Motion, Plaintiff is raising the following issues as grounds for reversal and remand: (1) whether the ALJ met his burden at step five of the sequential evaluation; and (2) whether the ALJ's RFC assessment is supported by substantial evidence.  (J. Mot. at 3.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is unsupported by substantial evidence in the record and contains no legal error.  See id.; Buck v. Berryhill, 869 F.3d 1040, 1048 (9th Cir. 2017).  "Substantial evidence means more than a mere scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (quoting Desrosiers v. Sec'y of Health & Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988)).  In determining whether the Commissioner's decision is supported by substantial evidence, a reviewing court "must assess the entire record, weighing the evidence both supporting and detracting from the agency's conclusion," and "may not reweigh the evidence or substitute [its] judgment for that of the ALJ."  Ahearn v. Saul, 988 F.3d 1111, 1115 (9th Cir. 2021).  Where the evidence can be interpreted in more than one way, the court must uphold the ALJ's decision.  Id. at 1115–16; Attmore v. Colvin, 827 F.3d 872, 875 (9th Cir. 2016).  The court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [he or she] did not rely."  Revels, 874 F.3d at 654 (internal quotation omitted).

## V.    RELEVANT MEDICAL RECORDS AND TESTIMONY

Plaintiff alleges that his period of disability began on May 14, 2021, after his employer eliminated his position as a customer service representative.  (AR at 41, 48–49.)  Though this termination coincided with the onset of Plaintiff's disability, Plaintiff testified that had the position remained available, he would have been unable to continue in the position due to his pre-existing mental health conditions.  (See id. at 49.)

### A.    Examination Findings

### 1.    Plaintiff's mental health treatment

Plaintiff received mental health therapy from Katie Pembleton, a licensed clinical marriage and family therapist ("LCMFT") beginning on May 25, 2020.  (See id. at 467.) Pembleton's notes from the intake interview indicate that Plaintiff claimed that he had been diagnosed with bipolar II disorder and OCD, and was seeking treatment for burnout and dissociation.  (See id.)  Pembleton's summary also referenced "mild difficulty with physical movement and engaging physically in the world."  (Id. at 470.)  Plaintiff continued to work with Pembleton regularly until September 21, 2020, when Plaintiff moved to California.  (See id. at 488.)  Pembleton's discharge notes described "incremental progress" alongside "moments of regression."  (Id.)

Plaintiff received treatment at Oceanside Health Center beginning on December 22, 2020.  (See id. at 392–94.)  Notes from his intake appointments indicate that he reported diagnoses of bipolar II disorder, anxiety, and depression.  (See id. at 391.)  Plaintiff also reported that a psychologist he had previously worked with suggested he showed signs of autism.  (See id.)  At a follow-up appointment in March 2021, Jim Cheng, a physician assistant ("PA"), listed diagnoses of bipolar II disorder, OCD, PTSD, ADHD, and autism spectrum disorder in Plaintiff's medical history.  (See id. at 387.) Plaintiff received medication for these conditions between February and September 2021,

including Lexapro,[5] Xanax,[6] Buspar,[7] Seroquel,[8] and Trazodone,[9] all of which proved ineffective or produced undesirable side effects.  (See id. at 367.)  Plaintiff noted that Gabapentin[10] he took for hip pain also helped manage his anxiety.  (See id.)  Louisa Triandis, a licensed clinical social worker ("LCSW"), reported treating Plaintiff between April and July 2021, and noted that Plaintiff had bipolar disorder and was on the autism spectrum.  (See id. at 500.)  Triandis claimed that these conditions, along with struggles with executive functioning and interpersonal interactions, made it "very difficult for [Plaintiff] to work" and that his insomnia "makes regular work impossible for him."  (Id.)

Sheila Cai, MD provided Plaintiff with psychiatric treatment from February 1, 2022, through November 30, 2022.  (See id. at 547–70.)  In addition, Plaintiff received

---

[5] Lexapro is the brand name of the antidepressant escitalopram sold by Allergan/Forest.  See Patton v. Forest Lab'ys, LLC, Case No. EDCV 17-922-MWF (DTBx), 2018 WL 5270476, at *2 (C.D. Cal. May 10, 2018); Joseph v. Cnty. of Alameda, Case No. 15-cv-00046-HSG (PR), 2016 WL 368112, at *2 (N.D. Cal. Feb. 1, 2016).

[6] "Xanax is a brand name 'tranquilizer used in the short-term relief of symptoms of anxiety or the treatment of anxiety disorders.'"  Shankles v. Astrue, No. 2:09-cv-01258-KJN, 2010 WL 5169077, at *2 n.13 (E.D. Cal. Dec. 14, 2010) (quoting Burger v. Astrue, 536 F. Supp. 2d 1182, 1189 n.8 (C.D. Cal. 2008)).

[7] Buspar is a brand name for buspirone, a medication used to treat anxiety.  See Uhuru v. Marshall, No. 08cv2424-IEG(AJB), 2009 WL 3246768, at *10 n.10 (S.D. Cal. Oct. 7, 2009); De Reyes v. Berryhill, Case No. CV 16-8351 AJW, 2017 WL 4564699, at *3 n.5 (C.D. Cal. Oct. 10, 2017).

[8] "Seroquel is a brand name for the drug quetiapine fumarate, which is indicated for the treatment of bipolar disorder and schizophrenia."  Shankles, 2010 WL 5169077, at *2 n.7 (citing PHYSICIAN'S DESK REFERENCE 751–52 (64th ed. 2010)).

[9] Trazodone is an antidepressant which may also be used to treat insomnia and schizophrenia.  See Castaneda v. Berryhill, Case No. EDCV 16-2528-JPR, 2018 WL 555453, at *5 n.12 (C.D. Cal. Jan. 23, 2018); Carmona v. Berryhill, Case No. EDCV 16-01376 AJW, 2017 WL 3614425, at *3 (C.D. Cal. Aug. 22, 2017).

[10] Gabapentin is "a non-narcotic neuropathic medication used to treat epilepsy and chronic pain." Arreguin v. Chin, No. CV 11-07252 JFW (AJW), 2012 WL 7018236, at *1 n.2 (C.D. Cal. Dec. 3, 2012); see also Jennifer C.G. v. Kijakazi, Case No. 5:22-cv-02192-MAR, 2023 WL 5592752, at *6 n.8 (C.D. Cal. Aug. 29, 2023).

therapy from Rashida Black, LCSW from October 26, 2022, to March 16, 2023.  (See id. at 698–715.)  Black's notes from Plaintiff's intake assessment on October 26, 2022 indicate diagnoses of bipolar II disorder, depression, anxiety, ADHD, OCD, and body dysmorphia.  (See id.)  Plaintiff reported taking Lamotrigine[11] to manage his bipolar II disorder, Lexapro to manage depression, Hydroxyzine[12] to manage anxiety, Trazodone to manage insomnia, and Gabapentin for both pain and insomnia.  (Id. at 712.)  Plaintiff reported transitioning off of Trazodone on February 23, 2023, due to improved sleep.  (Id. at 701.)  In the course of his treatment, Plaintiff reported "disorganization, overwhelm, anxiety, fear, obsessive thoughts, obsessive hand washing, dissociation, forgetfulness, challenges with task completion, and physical coordination issues" as factors that "hinder his ability to work."  (Id. at 700.)

### 2.    Plaintiff's physical impairments, treatment, and assessment

Plaintiff reported hip pain stemming from a fall in 2015, for which he underwent surgery on the left hip to repair a labral tear that year.  (See id. at 502–03.)  Plaintiff complained of ongoing hip dysplasia but stated that he "had never had any difficulty prior" to this fall.  (Id.)  A later MRI confirmed that Plaintiff had a "focal anterior superior left hip labral tear," but other findings were otherwise unremarkable.  (Id. at 629.)  Plaintiff took Gabapentin for chronic pain related to this tear and other ailments, as documented in the Administrative Record.  (See, e.g., id. at 440, 445, 496, 504, 574.)

Plaintiff complained of chronic wrist pain beginning in 2015.  (See id. at 509.)  Joanne Beecher-Van Horn, FNP, examined Plaintiff's wrist on March 16, 2022,

---

[11] Lamotrigine is a mood stabilizer and anticonvulsant drug used to treat epilepsy and as a mood stabilizer.  See Lopriore v. Comm'r of Soc. Sec., Case No. 18-CV-06970-LHK, 2019 WL 6612215, at *4 (N.D. Cal. Dec. 5, 2019); Burke v. Enenmoh, No. 1:10-cv-01584-LJO-SKO PC, 2014 WL 228560, at *2 (E.D. Cal. Jan. 21, 2014).

[12] Hydroxyzine is an antihistamine used as an anti-anxiety medication.  See Coleman v. Newsom, No. 2:90-cv-00520-KJM-DB, 2023 WL 3332254, at *532 (E.D. Cal. Feb. 7, 2023); Bennett v. Berryhill, Case No. 4:17-cv-00259-KAW, 2018 WL 1426675, at *2 (N.D. Cal. Mar. 22, 2018).

indicating pain, numbness, and weakness in the ventral left upper forearm in her notes. (See id. at 614.)  An MRI performed on April 13, 2022 confirmed mild atrophy of the pronator quadratus muscle, limiting Plaintiff's mobility with activity and causing weakness.  (Id. at 520.)  A follow-up electrophysiologic examination performed by Kenneth Vitale, MD on August 1, 2022 noted that Plaintiff's wrist was "[g]rossly within normal limits," but that "by comparison, [there was] relative reduced amplitude of [the] left median sensory branch to the ring finger and relative higher conduction velocity across the carpal tunnel on the right compared to the left."  (Id. at 590.)  Dr. Vitale noted that this could be "consistent with a mild, chronic, left CTS."  (Id.)  On September 23, 2022, Amy Trautman, PA at the Division of Hand and Microvascular Surgery within University of California, San Diego, counseled Plaintiff to wear a "compression wrist strap while typing and playing piano in addition to taking frequent breaks to stretch.". (Id. at 538.)  Plaintiff received occupational therapy from Nigel Lazaro for wrist pain from November 14, 2022, to March 15, 2023.  (See id. at 646–47.)  At the completion of this therapy, Lazaro reported that Plaintiff had "met 2 of 5 OT goals" and that he demonstrated "good initial strength" in the wrist, but that he struggled to perform task "for prolonged periods" due to pain and itching.  (Id. at 646.)

Plaintiff also described suffering from chronic lower back pain on October 6, 2022. (See id. at 621.)  An MRI determined that Plaintiff suffered from both "[m]ild degenerative disc disease of [the] lumbar spine without central lumbar spinal stenosis" and "[d]isc bulge vertebral ridging with mild bilateral foraminal narrowing L3-4 and L4-5 level."  (Id. at 622.)  Notes from a telemedicine visit with Anuj Gupta, MD, a neurologist, indicate that Plaintiff reported receiving "some injections in the past including a left SI joint injection without relief" to treat his back pain.  (Id. at 631.)

Plaintiff further alleged impairments related to chronic pain in his right knee.  (See id. at 433.)  He described this pain as being related to a "right patella subluxation" in 2015.  (Id. at 503.)  T. Divakaran, MD conducted an examination on March 24, 2022, which noted "no abnormality."  (Id. at 511.)  Plaintiff continued to seek treatment for

knee pain throughout 2022.  (See id. at 527, 602.)  An examination in July 2022, noted crepitus and a decreased range of motion but was otherwise normal.  (Id. at 603.) William Snyder, MD performed an X-Ray of Plaintiff's knee, which showed no significant arthropathy, acute abnormality, or visible soft tissue swelling, concluding that the knee was normal.  (Id. at 642.)

Plaintiff also has reported intermittent testicular pain since at least 2017.  (See id. at 599–601.)  Mark Preston, MD evaluated Plaintiff's scrotum with gray scale, color flow duplex Doppler sonography and spectral analysis, finding small bilateral hydroceles but determining that Plaintiff's scrotum was otherwise normal.  (Id. at 640.)

Plaintiff was evaluated for insomnia on October 26, 2021, at the Sleep Medicine Center.  (See id. at 456.)  He received a prescription for Zolpidem[13] on November 12, 2021.  (See id. at 446.)  Kinjal Madhav, MD, a sleep medicine specialist, met with Plaintiff on December 13, 2021, and recommended treating Plaintiff's insomnia by improving sleep hygiene, potentially increasing Gabapentin dosage, and treating obstructive sleep apnea.  (Id. at 456–57.)  At a follow-up visit on November 23, 2022, Dr. Madhav described improvement in Plaintiff's mood and better sleep hygiene, recommending that Plaintiff alter his medication dosage if challenges with sleep continued.  (See id. at 574–76.)

As part of his application for social security disability benefits, Plaintiff received a "physical residual functional capacity assessment" from F. Kalmar, MD.  (See id. at 91–94.)  Dr. Kalmar opined that Plaintiff had the ability to "[l]ift/carry 50 lbs occasionally, 25 lbs frequently, [s]tand/walk 6/8 hours, [s]it 6/8 hours."  (Id. at 94.)  Dr. Kalmar further opined that Plaintiff could frequently climb up ramps or stairs; occasionally climb ladders, ropes or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl.  (See

---

[13] "Zolpidem, marketed under the brand name Ambien in the United States, is used to treat insomnia." Brooks v. Saul, Case No. 18-cv-06958-MMC, 2020 WL 709304, at *4 n.14 (N.D. Cal. Feb. 12, 2020) (internal quotation marks omitted); see also Kripke v. Safeway, Inc., Case No. 3:18-cv-02808-WHO, 2018 WL 3491903, at *1 (N.D. Cal. July 20, 2018).

id. at 93.)  Dr. Kalmar then assessed Plaintiff's environmental limitations, recording that Plaintiff should "[a]void concentrated exposure" to extreme heat, extreme cold, vibrations, hazards, fumes, odors, dusts, gases and poor ventilation.  (Id. at 93–94.)

**B.**     **Plaintiff's Testimony and Statements, and Third-Party Reports**

         **1.     Plaintiff's testimony during administrative hearing**

At the administrative hearing, Plaintiff testified that he lived with his partner and a roommate.  (Id. at 44.)  Plaintiff stated that although he had a driver's license, he had not driven since 2006 due to "derealization and not being able to keep [his] attention."  (Id.)

Plaintiff also testified that he received minimal royalty payments from prior work in the music industry, and that his most recent employment had been in customer service and office management positions.  (See id. at 44–47.)  He reported that his most recent employment ended in 2021, when his employer abruptly eliminated the position.  (See id. at 48–49.)  Plaintiff explained that, even if the position had not been eliminated, he would have been unable to continue in that job due to memory problems, emotional issues, and anxiety.  (See id. at 49.)

Plaintiff further testified that he had chronic pain in the hip, back, left hand, and testicles.  (See id. at 50–53.)  He stated that he had been diagnosed with a left labral tear and a degenerative disc disease of the lower back.  (See id. at 50.)  Plaintiff described the pain in his hand as "nerve activation pain," claiming that it affected him "probably a couple times a week."  (Id. at 51–52.)  He further testified that he had received an ultrasound for his testicular pain identifying hydroceles.  (See id. at 53.)  Plaintiff described several strategies to manage these physical limitations, including taking Gabapentin to manage chronic pain, using a TENS device[14] to manage hip pain, and wearing a brace and compression gloves on his left hand.  (Id. at 50–52.)

---

[14] A Transcutaneous Electrical Nerve Stimulation ("TENS") device delivers a low-voltage electric current at or near the nerves to block or change the perception of pain.  See Stratton v. Life Ins. Co. of Am., 589 F.Supp.3d 1145, 1150 n.3 (S.D. Cal. 2022); Pratt v. Gamboa, 17-CV-04375-LHK, 2020 WL 2512407, at *2 n.2 (N.D. Cal. May 15, 2020).

Plaintiff testified that he could sit or stand for up to two hours before needing to switch positions, and could safely lift and carry a maximum of five pounds, given his physical limitations.  (See id. at 60.)  Plaintiff described regularly exercising at a gym in his apartment complex.  (See id. at 61–62.)

## 2.    Plaintiff's function reports

Plaintiff submitted a function report dated December 1, 2021.  (See id. at 281–88.) In this report, Plaintiff claimed that he lived with his partner, and that he was unable to work due to challenges related to his mental health and emotional regulation.  (See id. at 281.)  Plaintiff described taking medication, doing yoga, engaging in self-care activities, and having regular social interactions.  (See id. at 282.)  He claimed physical limitations including injuries to the knee, hip, and hand.  (See id. at 285.)  Plaintiff described these limitations as limiting his ability to play the piano or sit for long periods without pain and preventing him from lifting furniture or squatting.  (See id. at 285–86.)

Plaintiff submitted an additional functional report on May 27, 2022.  (See id. at 301–08.)  In this report, he reiterated and expanded upon the concerns presented in his first report, primarily focusing on his mental impairments.  (See id. at 301–02.) Additionally, Plaintiff stated that his chronic hip pain made it difficult to sit for extended periods of time, that his hand injury impacted his ability to type and grip objects, and that his knee weakness affected his ability to lift.  (Id. at 301.)  Plaintiff also reported difficulty lifting, squatting, bending, sitting, and kneeling and claimed to be able to walk two-to-three miles before needing to rest.  (See id. at 306.)

## 3.    Third-party statements from Plaintiff's partner

Plaintiff's partner, Miyuki Hughes, submitted third party function reports on December 1, 2021, and June 3, 2022.  (See id. at 276, 317.)  In the 2021 Report, Hughes claimed that Plaintiff was unable to "perform the basic requirements needed to adequately hold down employment."  (Id. at 270.)  Hughes' 2021 report noted Plaintiff's conflicts in the workplace, as well difficulty squatting, sitting, and lifting due to hip pain and a wrist injury.  (See id. at 274.)  Hughes' 2022 report explicitly emphasized that she

believed Plaintiff's inability to work was directly tied to his mental health concerns.  (See id. at 317.)  With respect to Plaintiff's physical limitations, Hughes' 2022 report only listed Plaintiff's hand injury which "limit[ed] [Plaintiff's] hand usage."  (See id. at 315.)

## VI.    DISCUSSION

### A.    The ALJ met his Burden at Step Five of the Sequential Evaluation

#### 1.    Parties' arguments

Plaintiff contends that the ALJ did not meet his burden at step five when he determined that jobs existed in significant numbers in the national economy that Plaintiff could perform.  (J. Mot. at 3–4.)  Specifically, Plaintiff alleges that the ALJ committed reversible error by failing to elicit an explanation from the VE, and leaving conflicts unresolved after finding that the VE's testimony was inconsistent with the Dictionary of Occupational Titles ("DOT").  (See id. at 3.)  Plaintiff argues the ALJ impermissibly relied on the VE's testimony without eliciting a specific explanation for a conflict the ALJ identified between the VE's testimony and the DOT, instead referencing "reasonable explanations" and the VE's testimony that the "occupations identified could be performed by the claimant with the limitations above."  (Id. at 6.)  Plaintiff claims that the ALJ failed to identify additional conflicts between the VE's testimony and the DOT, and that, in the absence of clear identification of and explanation for these conflicts, the ALJ's opinion at step five is not supported by substantial evidence.  (See id. at 6–8.)

Defendant argues that the ALJ's instruction of the VE to "let us know" if the VE's testimony conflicted with the DOT satisfies the ALJ's burden to identify conflicts between the VE's testimony and the DOT under Ninth Circuit precedent.  (Id. at 8.)  Defendant maintains that, while the ALJ must resolve apparent conflicts between the VE's testimony and the DOT, the ALJ is not specifically required to ask the VE to identify such conflicts at a specific time.  (See id. at 9.)

#### 2.    Applicable law

At step five of the sequential evaluation process, "the Commissioner has the burden 'to identify specific jobs existing in substantial numbers in the national economy

that [a] claimant can perform despite [his] identified limitations.'" Zavalin v. Colvin, 778 F.3d 842, 845 (9th Cir. 2015) (quoting Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995)). In determining if other suitable work exists that the claimant may be able to perform, the ALJ is to rely on the DOT, and may also rely on the testimony of VEs who testify about specific occupations that a claimant can perform in light of their RFC. See id. at 845–46; Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009).

An ALJ is required to investigate any conflict between the VE's testimony and the DOT, and specifically inquire whether there is any conflict between the VE's testimony and the DOT. See Shaibi v. Berryhill, 883 F.3d 1102, 1109 (9th Cir. 2017); Massachi v. Astrue, 486 F.3d 1149, 1153–54 (9th Cir. 2007). Under both Ninth Circuit precedent and the relevant agency standards, the ALJ may rely on a VE's testimony only after determining whether there is a conflict between the DOT and the VE's testimony. See id. at 1153. If a conflict exists, the ALJ must then "determine whether the vocational expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the [DOT]." Id. "[A]n ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation." Johnson, 60 F.3d at 1435. The ALJ's failure to ask about any potential conflict, however, does not automatically require remand, and is analyzed under the harmless error standard. See Massachi, 486 F.3d at 1154 n.19 (noting that "[t]his procedural error could have been harmless, were there no conflict, or if the vocational expert had provided sufficient support for her conclusion so as to justify any potential conflicts").

A conflict between the VE's testimony and the DOT exists when the VE's testimony is obviously or apparently contrary to the DOT's listing of job requirements that are "essential, integral, or expected." Gutierrez v. Colvin, 844 F.3d 804, 808 (9th Cir. 2016). A conflict is "obvious or apparent" when the VE's testimony is at odds with "essential, integral, or expected" requirements of the occupation identified by the VE. Id.; see also Lamear v. Berryhill, 865 F.3d 1201, 1205 (9th Cir. 2017). The VE's

1  testimony does not conflict with the DOT if the "frequency or necessity of a task is

2  unlikely and unforeseeable." Gutierrez, 844 F.3d at 808.  If a conflict exists, the ALJ

3  does not automatically give the DOT or the VE's testimony higher preference.  Massachi,

4  486 F.3d at 1153.  Instead, the ALJ must ask follow-up questions to determine whether

5  the VE's explanation for the conflict is reasonable and whether a basis exists for relying

6  on the expert rather than the DOT.  Id.  "The requirement for an ALJ to ask follow up

7  questions is fact-dependent." Guttierez, 844 F.3d at 808.  "To avoid unnecessary appeals,

8  an ALJ should ordinarily ask the VE to explain in some detail why there is no conflict

9  between the DOT and the applicant's RFC." Lamear, 865 F.3d at 1205.

10      **3.    Analysis**

11      The ALJ found that Plaintiff has the RFC "to perform medium work as defined in

12  20 CFR 404.1567(c)" with restrictions, including the ability to only "frequently handle

13  and finger with the non-dominant left extremity," and the specification that Plaintiff must

14  "avoid concentrated exposure to extreme cold, extreme heat, vibrations, fumes, odors,

15  gases, and other pulmonary irritants."  (AR at 23.)  The ALJ classified Plaintiff's past

16  relevant work as "[c]ustomer complaint clerk, DOT 241.367-014, a sedentary skilled

17  (SVP 5) occupation, as actually and generally performed;" "[s]ecretary, DOT 201.362-

18  030, a sedentary, skilled (SVP 6) occupation, as actually and generally performed;" and

19  "[i]nstrumental musician, DOT 152.041-010, a light, skilled (SVP 8) occupation, as

20  actually and generally performed."  (Id. at 30.)  The ALJ found that, based on the VE's

21  testimony, and given "the claimant's residual functional capacity with the physical and

22  mental demands of this past relevant work . . . the claimant is unable to perform past

23  relevant work as actually or generally performed."  (Id.)

24      At the administrative hearing, the VE testified that a hypothetical claimant of

25  Plaintiff's age, education, and work experience with Plaintiff's could perform the jobs of

26  cleaner II, DOT 919.687-014b (54,000 jobs); hospital cleaner, DOT 323.687-010 (34,000

27  jobs); and floor waxer, DOT 381.687-034 (110,000 jobs) with the postural, manipulative,

28

and environmental limits identified in Plaintiff's RFC.  (Id. at 70–71.)  The ALJ stated

that he had determined the VE's testimony was:

> consistent with the information contained in the *Dictionary of Occupational Titles*, except there is a conflict regarding the testimony and the claimant's ability to perform the occupation as a cleaner.  The DOT indicates that this job requires constant handling, whereas the claimant can only frequently handle with his upper left extremity.  There are, however, reasonable explanations for the discrepancy.  The vocational expert testified that this [sic] occupations identified could be performed by the claimant with the limitations above.  The undersigned relies on the vocational expert's documented qualifications in accepting the opinion about issues that are in apparent conflict with the *Dictionary of Occupational Titles* or its companion publications

(Id. at 31.)  The ALJ accepted the VE's testimony on this basis and used this testimony as

the basis for his step five determination that jobs exist in significant numbers in the

national economy that Plaintiff could perform.  (Id. at 30–31.)

> **a.    Instructing the VE to inform the court of any inconsistencies did not discharge the ALJ's duty to identify conflicts**

The ALJ instructed the VE to "let us know" if his testimony was "inconsistent with

the DOT or the SCO."[15]  (See id. at 68.)  The ALJ did not give further instruction

regarding inconsistencies between the VE's testimony and the DOT.  (See id. at 68–72.)

Plaintiff correctly asserts that the ALJ has an independent and affirmative duty to resolve

obvious or apparent conflicts between the VE's testimony and the DOT's listings.  See

Gutierrez, 844 F.3d at 807.  While the ALJ should direct the VE to identify conflicts, the

VE's representation of consistency between the testimony and the DOT is itself

insufficient to satisfy the ALJ's duty to reconcile conflicts.  See Lamear, 865 F.3d at

1205 n.3 (quoting Moore v. Colvin, 769 F.3d 987, 990 (8th Cir. 2014)) ("The ALJ is not

---

[15] The SCO refers to the "Selected Characteristics of Occupations," a companion publication to the Dictionary of Occupational Titles.  See Bonkofsky v. Comm'r of Soc. Sec., No. 2:23-cv-2690 AC, 2025 WL 277193, at *8 (E.D. Cal. Jan. 23, 2025); see also Barkzai v. Berryhill, Case No. 17-cv-1692-W (RNB), 2018 WL 3126093, at *4 (S.D. Cal. Jun. 26, 2018).

1   absolved of this duty [to reconcile conflicts] merely because the VE responds 'yes' when

2   asked if her testimony is consistent with the DOT.").  Accordingly, the ALJ did not

3   discharge his duty to identify and resolve obvious or apparent conflicts.

4              **b.    The ALJ's committed harmless error by not eliciting an**

5   **explanation of the identified conflict between the VE's testimony and the DOT**

6              Plaintiff asserts that the ALJ committed reversible error by failing to elicit an

7   explanation from the VE regarding the identified conflict between the VE's testimony

8   and the definitions in the DOT.  In his opinion, the ALJ identified a conflict between the

9   "constant" handling required of the cleaner II position and Plaintiff's RFC, which

10  specified that Plaintiff could only engage in "frequent" handling.  (AR at 31.)  The ALJ

11  explained that the conflict could be resolved because the VE testified that the

12  "occupations identified could be performed by the claimant with the limitations above."

13  (Id.)  The VE did not provide any further explanation and did not identify this conflict

14  during the hearing.  (See id. at 31, 70–72.)

15             While the ALJ correctly identified the conflict between the requirements for the

16  job of cleaner II and the limitations present in Plaintiff's RFC, the ALJ's failure to

17  examine the VE regarding this conflict constitutes error.  See Gutierrez, 844 F.3d at 807

18  (explaining that the ALJ "must ask the [vocational] expert to reconcile" a conflict before

19  relying on that expert's testimony).  Such error, however, was harmless.  According to

20  the DOT, cleaner II position requires "constant" handling, while "floor waxer" and

21  "hospital cleaner" positions require only "frequent" handling.  See DOT 919.687-014,

22  1991 WL 687897; DOT 323.687-010, 1991 WL 672782; DOT 381.687-034, 1991 WL

23  673262.  Ability to frequently handle is consistent with Plaintiff's assessed RFC.  (See

24  AR at 23.)  The ALJ only needed to identify one occupation that exists in significant

25  numbers in the national economy to satisfy the Social Security Administration's burden

26  at step five.  See Wolfe v. Astrue, No. 09-CV-922-BR, 2010 WL 3222109, at *7 (D. Or.

27  Aug. 13, 2010).  While there is no bright line number to reference in determining whether

28  the occupation at issue exists in "significant numbers," other courts have found

substantial evidence at step five based on job numbers well below 100,000. See Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 529 (9th Cir. 2014) (finding 25,000 jobs nationally to be a significant number); see also Garner v. Saul, 805 F. App'x 455, 459 (9th Cir. 2020) (finding 30,000 jobs of one occupation nationally to meet the statutory standard). The existence of 34,000 hospital cleaner positions and 110,000 floor waxer positions, (see AR at 31), illustrates that the occupations exist in significant numbers in the national economy, even without taking the cleaner II position into account. Therefore, the ALJ's error was harmless.

### c. The ALJ did not err by not identifying a conflict between the VE's testimony and the DOT surrounding the use of chemical cleaners

The DOT defined that the duties of a cleaner II position as follows:

> Cleans interiors and exteriors of transportation vehicles, such as airplanes, automobiles, buses, railroad cars, and streetcars: Cleans interior of vehicle, using broom, cloth, mop, vacuum cleaner, and whisk broom. Cleans windows with water, cleansing compounds, and cloth or chamois. Replenishes sanitary supplies in vehicle compartments. Removes dust, grease, and oil from exterior surfaces of vehicles, using steam-cleaning equipment, or by spraying or washing vehicles, using spraying equipment, brush or sponge. May polish exterior of vehicle. May fumigate interior of vehicle, using gases or sprays.

DOT 919.687-014, 1991 WL 687897. Additionally, the duties of a hospital cleaner are as follows:

> Cleans hospital patient rooms, baths, laboratories, offices, halls, and other areas: Washes beds and mattresses, and remakes beds after dismissal of patients. Keeps utility and storage rooms in clean and orderly condition. Distributes laundered articles and linens. Replaces soiled drapes and cubicle curtains. Performs other duties as described under CLEANER (any industry) I Master Title.[16] May disinfect and sterilize equipment and supplies, using germicides and sterilizing equipment.

---

[16] The Court notes that this occupation is defined as follows:

> Maintains premises of commercial, institutional, or industrial establishments, office buildings, hotels and motels, apartment houses, retirement homes, nursing homes,

1    DOT 323.687-010, 1991 WL 672782.  Further, the duties of a floor waxer are as follows:

2

3       Cleans, waxes, and polishes floors by hand or machine: Removes dirt and
        blemishes from floor, using various cleaning solvents and compounds,
4       according to composition of floor.  Applies paste or liquid wax to floor with
        rags or machine.  Polishes floor with electric polishing machine or weighted
5       brush.

6    DOT 381.687-034, 1991 WL 673262.

7       Plaintiff contends that the VE's testimony that Plaintiff could perform these duties

8    conflicts with Plaintiff's RFC because "all three jobs require the use of chemical cleaning

9    products," the assessed RFC limits her "exposure to pulmonary irritants," and "some

10   chemicals contained in cleaning products are considered pulmonary irritants."  (J. Mot. at

11   6 (citing Choking/Lung/Pulmonary Agents (Irritant/Corrosive – Inhalation Toxidrome,

12   U.S. Dept. of Health & Hum. Servs., https://chemm.hhs.gov/lungagents.htm#/

13   :~:text=Choking%2Flung%2Fpulmonary%20agents%20are,known%20as%20Irritant%2

14   0Gas%20Syndrome (last visited Jan. 24, 2025)).)  Plaintiff's assertion relies upon the

15   premise that ammonia, chlorine, or phosgene exist in the cleaning compounds referenced

16   in the job descriptions provided by the VE.  (See J. Mot. at 6; see also id. at 7.)  Plaintiff

17   has provided no evidence that these chemical compounds are present in the chemicals

18   referred to by the DOT.  Moreover, the DOT specifically notes that caustic chemicals and

19   other environmental conditions are not present for any of the jobs the VE listed.  See

20   DOT 919.687-014, 1991 WL 687897; DOT 323.687-010, 1991 WL 672782; DOT

21

22

23       hospitals, schools, or similar establishments in clean and orderly condition, performing the
         following duties: Cleans rooms, hallways, lobbies, lounges, rest rooms, corridors,
24       elevators, stairways, and locker rooms and other work areas.  Sweeps, scrubs, waxes, and
         polishes floors, using brooms and mops and powered scrubbing and waxing machines.
25       Cleans rugs, carpets, upholstered furniture, and draperies, using vacuum cleaner.  Dusts
         furniture and equipment.  Polishes metalwork, such as fixtures and fittings.  Washes walls,
26       ceiling, and woodwork.  Washes windows, door panels, and sills.  Empties wastebaskets,
         and empties and cleans ashtrays.  Transports trash and waste to disposal area.  Replenishes
27       bathroom supplies.  Replaces light bulbs.

28   1991 WL 645969.

381.687-034, 1991 WL 673262.  Plaintiff's assertion that the use of cleaning compounds presents an apparent conflict with Plaintiff's RFC necessitating resolution from the ALJ is without merit.  The ALJ is only required to resolve "obvious or apparent" conflicts, where the VE's testimony is "at odds with the [DOT's] listing of job requirements that are essential, integral, or expected."  Gutierrez, 844 F.3d at 808.  Plaintiff's argument would require the Court to find error based on the ALJ not assuming the chemical composition of certain cleaning compounds based on his own knowledge and contrary to the DOT.  Such assumptions are not permissible.  See Tommasetti v. Astrue, 533 F.3d 1035, 1042 (9th Cir. 2008) (quoting Johnson, 60 F.3d at 1435) (internal quotation marks omitted) (stating that the ALJ may not offer his "own speculative explanation to rebut the DOT's presumptive" requirements, and that the ALJ "may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation.").  The ALJ thus did not err by not identifying a conflict surrounding the use of chemical cleaners.  The Court therefore **RECOMMENDS** that the District Judge find that the ALJ met his burden at step five of the sequential evaluation process.

**B.    The ALJ's RFC Assessment is Supported by Substantial Evidence**

    **1.    Parties' arguments**

Plaintiff argues that the ALJ erred by failing to explain how Plaintiff remained capable of lifting fifty pounds given his medically-determinable impairments of atrophy of the left upper extremity, a labral tear of the left hip, and nerve root impingement at L3.  (See J. Mot. at 11.)  Plaintiff asserts that the ALJ's assessed RFC is inconsistent with objective evidence from the record and that the ALJ erred in failing to explain or even address these inconsistencies.  (See id.)  Plaintiff further claims that the ALJ improperly relied on the conclusions reached by consultative examiner Amy Kanner, M.D. despite finding Dr. Kanner's opinion only partially persuasive.  (See id. at 13–14.)  Plaintiff maintains that, absent an explanation of the ALJ's reasons for crediting Dr. Kanner's conclusion despite discounting her analysis, the Court should conclude that the ALJ

1   impermissibly engaged in his own exploration and assessment of objective medical

2   evidence to arrive at Plaintiff's RFC.  (See id. at 13.)  Plaintiff claims that this alleged

3   lack of support for Plaintiff's RFC in the record requires reversal and remand.  (Id. at 15.)

4       Defendant contends that the ALJ reasonably rejected Plaintiff's alleged limitations

5   based on the evidence in the record.  (See id.)  Defendant points out that the ALJ

6   references numerous treatment reports describing objective findings, which were

7   inconsistent with Plaintiff's claimed limitations, as well as finding that these limitations

8   conflicted with Plaintiff's reports of daily living.  (See id. at 16.)  Defendant argues that

9   such references to medical records and Plaintiff's testimony are sufficient grounds for the

10  ALJ to reject Plaintiff's assertions regarding his limitations.  (See id. at 17.)  Defendant

11  claims that the ALJ properly discounted Dr. Kanner's opinion as not entirely consistent

12  with other examinations.  Moreover, Defendant claims that, because the ALJ's RFC

13  determination was "*more* restricted than Dr. Kanner opined—to the Plaintiff's benefit,"

14  no conflict exists.  (Id. at 19.)

15      **2.    Applicable law**

16      RFC refers to what the claimant can do in a work setting, despite the claimant's

17  mental or physical limitations caused by impairments or related symptoms.  20 C.F.R.

18  § 404.1545(a)(1); see also SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996) (providing

19  that an RFC "is an assessment of an individual's ability to do sustained work-related

20  physical and mental activities in a work setting on a regular and continuing basis.").  In

21  assessing the claimant's RFC, the ALJ must consider all of the claimant's medically

22  determinable impairments, including nonsevere medically determinable impairments.  20

23  C.F.R. § 404.1545(e).  "[A]n ALJ must consider all relevant evidence in the record,

24  including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms,

25  including pain, that are reasonably attributed to a medically determinable impairment.'"

26  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) (quoting SSR 96-9p,

27  1996 WL 374184, at *5).  Careful consideration must be given to "any evidence about

28

symptoms 'because subjective descriptions may indicate more severe limitations or restrictions than can be shown by medical evidence alone.'" Id.

The RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. § 404.1546(c); Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (citing 20 C.F.R. § 404.1545) ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."). Where "the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict." Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003); see also Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999) (holding that the ALJ was "responsible for resolving conflicts" and "internal inconsistencies" within physician's reports); Tommasetti, 533 F.3d at 1041 ("the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence"). In determining whether an ALJ committed error in assessing the RFC, the relevant inquiry is whether the medical evidence supports the ALJ's finding. See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173–74 (9th Cir. 2009) (holding that the RFC assessment adequately captured restrictions when it was consistent with the concrete limitations in the medical opinions).

### 3. Analysis

The ALJ determined that Plaintiff had the RFC to:

> perform medium work as defined in 20 CFR 404.1567(c) except he can frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds. He can frequently balance, stoop, kneel, crouch, and crawl. He can frequently handle and finger with the non-dominant left upper extremity. He must avoid concentrated exposure to extreme cold, extreme heat, vibrations, fumes, odors, gases, and other pulmonary irritants, as well as hazards, such as operational control of moving machinery and unprotected heights. He can understand, remember, and carry out simple, routine tasks, have only occasional interaction with the general public, only occasional work-related, non-personal, non-social interaction with co-workers and supervisors. He is limited to jobs requiring only simple work-related decisions; however, he can keep pace sufficiently to complete tasks and meet quotas typically found in unskilled work.

(AR at 23.)

Under Ninth Circuit precedent, the ALJ must provide "'a discussion of the evidence' and 'the reason or reasons upon which' his adverse determination is based." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1103 (9th Cir. 2014) (quoting 42 U.S.C. § 405(b)(1)); see also Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (quoting Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.").  Where a conflict exists between a claimant's testimony and medical opinion evidence, the ALJ must evaluate the medical opinion evidence based on its supportability and consistency with other evidence in the record before relying upon it.  See Woods v. Kijakazi, 32 F.4th 785, 791–92 (9th Cir. 2022) (describing supportability based on objective medical evidence and consistency with evidence from medical and non-medical sources as the most important factors in determining the persuasiveness of medical opinions).  Yet, an ALJ is not required "to perform a line-by-line exegesis of the claimant's testimony, nor . . . to draft dissertations when denying benefits."  Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citing Treichler, 775 F.3d at 1103).

To support Plaintiff's RFC, the ALJ provided a detailed summary of the medical evidence he incorporated into it, including evidence of Plaintiff's physical limitations.  (See AR at 23–29.)  This included Adult Function Reports from Plaintiff, where the ALJ noted both functional difficulties in "lifting, squatting, [and] sitting," as well as Plaintiff's reports that he was able to "walk about 3 miles before requiring rest" and "take care of his personal needs."  (Id. at 24.)  The ALJ further noted treatment records related to Plaintiff's physical impairments, including his hand and wrist pain, labral tear, and back pain.  (Id. at 25–26.)

The ALJ noted Plaintiff's wrist pain by referencing progress notes from a March 16, 2022 visit to Plaintiff's primary care provider where Plaintiff described his wrist pain and its limiting effect on his ability to carry groceries and play piano.  (See id.

at 25, 614–16.)  The ALJ discussed treatment for Plaintiff's wrist pain by referencing Dr. Trautman's notes from Plaintiff's September 23, 2022 consultation, which described unremarkable X-rays and mild atrophy seen in an MRI.  (See id. at 25, 538–40.)  The ALJ considered the records from Plaintiff's occupational therapy, noting that Plaintiff's wrist had improved with treatment, and Plaintiff's tolerance for playing piano improved from one minute to four minutes.  (See id. at 25, 646.)  The ALJ also considered Plaintiff's left buttock pain, stating that an MRI performed on February 3, 2023 showed a labral tear, but was otherwise unremarkable.  (See id. at 25, 628–29.)  The ALJ discussed evidence related to Plaintiff's back pain and noted the results of an MRI taken on October 6, 2022, which showed mild degenerative disc disease of the lumbar spine.  (See id. at 25, 621–22.)  The ALJ further considered Dr. Anuj Gupta's November 3, 2022 examination of Plaintiff's back, which found tenderness, but a normal range of motion.  (See id. at 25, 635–39.)

The ALJ placed special emphasis on the opinion of Dr. Amy Kanner, a consultative examiner who "opined that the claimant is limited to a range of medium work, which was generally supported by [Dr. Kanner's] examination."  (Id. at 28.)  The ALJ specifically pointed to Dr. Kanner's findings that Plaintiff had:

> no tenderness to palpitation, normal range of motion in his upper extremities, no joint deformities, and normal pinch and grip strength.  He had 5/5 motor strength in his extremities.  He had pain in his left hip with adduction testing but intact range of motion with no trochanteric bursal tenderness.  He had no tenderness to palpitation or muscle spasm in his lumbar spine, negative straight-leg raise, and normal range of motion.

(Id. at 28.)  The ALJ noted that "these findings supported the opinion."  (Id. at 29.)  The ALJ then discounted Dr. Kanner's opinion on the basis that "the rest of the record indicated that [Plaintiff] would be more limited than opined."  (Id.)

The ALJ also emphasized the opinion of the state medical examiner, Dr. F. Kalmar, which indicated that Plaintiff "is limited to a range of medium work."  (Id.)  The ALJ determined that the opinion was partially persuasive, based on Plaintiff's function

reports regarding his ability to "lift weights and workout, do household chores, prepare meals, shop and do martial arts." (Id.)  The ALJ also found that Dr. Kalmar's opinion was consistent with medical evidence that Plaintiff "had mostly normal motor strength in his extremities, normal range of motion in his hip and lumbar spine, and normal gait." (Id.)  The ALJ discounted this opinion as only partially persuasive, based on medical evidence of Plaintiff's degenerative disc disease, lumbar tear, left hand pain, mild atrophy of the upper left extremity, tightness with Phalen's, and sporadically diminished range of motion in his upper extremity.  (See id.)  The ALJ then determined that Plaintiff "would be more limited in handling and fingering with his left upper extremity than was indicated" by Dr. Kalmar.  (Id.)  The ALJ included these limitations in Plaintiff's RFC.

Plaintiff asserts that the ALJ committed error by failing to explain why he chose to credit part of Dr. Kanner's opinion.  (See J. Mot. at 12–14.)  This ignores the ALJ's analysis of Dr. Kanner's opinion under the supportability and consistency factors.  (See AR at 28–29.)  The ALJ is permitted to rely upon opinion evidence from government consultants in formulating an RFC if they determine this opinion to be persuasive based on the consistency and supportability factors.  See Woods, 32 F.4th at 791–92 (elaborating the standard under which medical opinion evidence is evaluated).  The ALJ determined that Dr. Kanner's opinion that Plaintiff could perform medium work was generally supported by Dr. Kanner's examination findings that Plaintiff "had no tenderness to palpation, normal range of motion in his upper extremities, no joint deformities, and normal pinch and grip strength," as well as normal range of motion in his hip and lumbar spine.  (AR at 28–29.)  This contrast of Dr. Kanner's opinion with "relevant . . . objective medical evidence" in the record constitutes a supportability analysis.  Woods, 32 F.4th at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)).  The ALJ's subsequent discussion of Dr. Kalmar's opinion alongside that of Dr. Kanner and Plaintiff's Adult Function reports is sufficient to demonstrate consistency "with the evidence from other medical sources and nonmedical sources in the claim."  See Woods, 32 F.4th at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)).

1         The ALJ's partial discounting of medical opinion evidence does not invalidate the

2    remainder of the opinion.  The Ninth Circuit has affirmed the ability of the ALJ to rely on

3    partially discounted medical evidence, provided the ALJ clearly demonstrates which

4    parts of the opinion are unpersuasive and which they are relying upon.  See Thomas v.

5    Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (elaborating that the ALJ properly relied on a

6    physician's non-discounted examination, even after partially discounting the physician's

7    opinion as unsupported).  Here, the ALJ clearly stated that Dr. Kanner's opinion was

8    "persuasive as to whether Plaintiff's can perform medium work . . . [with] additional

9    limitations," consistent with Dr. Kanner's examination findings.  (AR at 29.)  The ALJ

10    properly distinguished this finding from those parts of the opinion he had determined

11    were not supported by the record, as discussed above.  Plaintiff is thus unable to show

12    error based on the ALJ's reliance on partially discounted medical opinion evidence.

13         Plaintiff's argument that the ALJ insufficiently explained how Plaintiff retained the

14    capacity to lift fifty pounds despite his limitation is also without merit.  The ALJ

15    permissibly relied upon the opinions of Dr. Kanner and Dr. Kalmar in assessing

16    Plaintiff's ability to perform medium work, including his ability to lift fifty pounds.

17    Ninth Circuit precedent requires the ALJ to provide "some reasoning" such that "the

18    agency's path" can "reasonably be discerned."  See Treichler, 775 F.3d at 1103.  The

19    ALJ specifically noted that the opinions of Dr. Kanner and Dr. Kalmar were persuasive

20    regarding Plaintiff's ability to perform medium work, with certain additional limitations.

21    (See AR at 29.)  The definition of medium work includes the claimant's capacity to "lift

22    weights of up to fifty pounds at a time," and frequently lift weights of up to twenty-five

23    pounds, a capacity which both Dr. Kanner and Dr. Kalmar explicitly opined that Plaintiff

24    retained.  See 20 C.F.R. § 404.1567(c); (see also AR at 94, 509).  The ALJ's finding that

25    these opinions were persuasive regarding Plaintiff's ability to lift and carry various

26    weights sufficiently demonstrates the reasoning behind the ALJ's RFC finding to this

27    effect.

28

Moreover, even if the ALJ had committed error in relying upon Dr. Kanner and Dr. Kalmar's partially discounted opinions, Plaintiff would be unable to show harm arising from this error that would warrant remand. Plaintiff has not shown any medical opinion in the record supporting an RFC more restrictive than the RFC assessed by the ALJ. See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (explaining that a plaintiff who failed to produce a medical opinion restrictive enough to demonstrate disability has failed to carry the burden of proving that an impairment is disabling). Plaintiff bears the burden of demonstrating harm arising from the ALJ's alleged error. See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) (providing that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"). Because "the ALJ's final RFC determination is more limited than the physical functionality opinions of all of the other examining and reviewing physicians, Plaintiff cannot show harm by the ALJ's weighing of their opinions." Valerie C. v. Berryhill, Case No. 5:17-cv-02209-GJS, 2019 WL 450675, at *5 (C.D. Cal. Feb. 5, 2019); see also Calvert v. Comm'r of Soc. Sec., Case No. 1:24-cv-00119-EPG, 2024 WL 3793965, at *3 (E.D. Cal. Aug. 13, 2024) (concluding that a plaintiff had not shown harmful error where she had not offered any medical opinion assessing functional restrictions greater than that in the ultimate RFC); Herrera v. Colvin, No. ED CV 13-1734-SP, 2014 WL 3572227, at *5 (C.D. Cal. July 21, 2014) (same). Accordingly, any alleged error by the ALJ was harmless. The Court therefore **RECOMMENDS** that the District Judge find that the ALJ's RFC determination was supported by substantial evidence.

## VII.   CONCLUSION

For the reasons set forth above, the Court **RECOMMENDS** that the Commissioner's decision be **AFFIRMED** consistent with this **Report and Recommendation**.

Additionally, **IT IS ORDERED** that no later than **February 28, 2025**, any party to this action may file written objections with the Court and serve a copy on all parties. The document shall be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **March 7, 2025**.  The parties are advised that failure to file objections within the specified time may waive the right to raise these objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED**

Dated:  February 21, 2025

_____
Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge

24cv322-JES (LR)